Case No. 15-5147, Union Neighbors United, Inc. Appellant v. Sally Jewell and her official capacity as Secretary of the United States Department of the Interior at Elle. Mr. Weeks for the Appellant, Mr. Stockman for Appley-Sally Jewell, Mr. Whiteland for Appley-Buckeye-Wend, LLC. Mr. Weeks. Your Honor, may it please the Court, I represent Union Neighbors United in this matter and would like to reserve two minutes for rebuttal. We seek a remand to the Fish and Wildlife Service with instructions to reconsider the incidental take permit under a proper legal interpretation of Section 10 of the Endangered Species Act and to consider a reasonable range of alternatives in its environmental impact statement. In support, we submit that the Department of Energy predicts that in 15 years, the nation's wind energy will supply about four times as much energy as it does today. That means we're going to put up a lot of new wind turbines. Wind turbines kill a lot of birds and bats. For example, in the Midwest alone, in the next 20 years, with reduction measures, the Fish and Wildlife Service estimates that wind turbines will kill almost 3 million bats. Some of these are endangered. As currently permitted, with operating measures to reduce its impact on wildlife, the Ohio Wind Project in this case will still kill 130 endangered Indiana bats. A Fish and Wildlife employee commented at Joint Appendix 107, that's beyond any take we have ever authorized. Everybody involved in this case, however, has benefited by a fortunate coincidence, including the bats. Bats don't like to fly in high winds. Wind turbines produce very little power at low wind speeds and only begin to be efficient when winds are pretty brisk. So if we prevent the wind turbines from turning when they produce the least power at low wind speeds, we kill a lot fewer bats without losing too much power generating capacity. I'd like to ask you a question about your NEPA claim. Yes. Let's suppose an agency evaluates three alternatives, A, B, and C. And basically, as it's completing the final environmental impact statement, concludes that alternative C is neither technologically nor economically feasible. It didn't know that, or maybe it thought that it was going into the process, but by the time they're finishing the environmental impact statement, they conclude that it's not feasible. Yes. Is there authority that says at that point that they have to stop and not issue the final EIS, but come up with another alternative? Well, in your case, given the facts that you've given me, they didn't know whether the third alternative they meant, it sounds like your hypotheticals meant that they meant to have a reasonable range of alternatives. But in this case... Answer my question about that case. As far as I know, that would meet the requirements of having a reasonable range of alternatives. It would or would not? It would meet. Even though, in fact, they didn't have a reasonable range because the third range is not viable? Well, they learned that it was not viable upon doing the analysis of that case, upon considering it in the environmental impact statement. In the process of considering the alternatives, they say, we're going to examine this alternative. It appeared to us to be viable, but on closer examination, it doesn't appear to be viable. That isn't the case in this one. In this case, the alternative that we call the shutdown alternative was not economically viable. And yet they continued through the process and purport to have a reasonable range of alternatives, including an alternative that they had known since far before the first draft environmental impact statement was unlikely to be viable. When you say the consultant said that, what are you pointing to? This is Consultant Tim, and I will get you this slide from the record. She actually tells the Fish and Wildlife Service to do one of two things, I think. Either drop it because it's not economically viable or consider it or bring it forward and consider it in some respect. It's an interesting thing, though. Let's continue with the National Environmental Policy Act claim, because I think it's interesting to know why we didn't end up with a reasonable range of alternatives. I want to highlight the manner in which the service went from favoring a reasonable range to disavowing it, because it's relevant to both the NEPA and the Endangered Species Act claims. Back in 2010, in early discussion of a draft environmental impact statement, the service at Joint Appendix 96 thought it would add a 6.5 meter per second cut-in speed to the alternatives it considered in the impact statement. But that alternative was never added. It was never considered. The Joint Appendix at 112 through 117, to me, illustrates why. The Fish and Wildlife Service had an employee that said, Are we going to implement the requirement that we minimize the impacts of the take to the maximum extent practical? And if so, how? The Fish and Wildlife Service Regional Office answers that as long as the Jeopardy standard is met, we have met to minimize the impacts of the take to the maximum extent practical. I'm sorry to go back on something, but I think what you were referring to was the attempts to see more. Yes. But what does that tell us about what FWS itself thought? Because it can often be the case, including in Judge Wilkinson's hypothetical, that the agency might get input to the effect that something's infeasible, but that doesn't tell you that the agency itself has concluded that the alternative is infeasible. If the agency actually felt that there was a question about whether it was feasible or not, they might actually have studied it, as they said they had retained it to do. But there's no evidence that they actually took a look at it. And frankly, it wasn't a – I thought JA-92 was where the Fish and Wildlife Service people said that it's not economically viable. I thought that was your answer. Exactly. I mean, that's further evidence that they didn't think it was economically viable. I mean, and it seems to me that we – Well, you'd have to conclude that JA-92 is the agency itself saying it, as opposed to the agency characterizing what the consultants said. Right. That's the question. That's certainly possible. But listen, we're talking about an alternative that's taking the wind turbines and shutting them down for about a quarter of the year. The likelihood that that was going to be a viable alternative that represented reduced impacts to compare it to Buckeye's preferred alternative was extremely unlikely. And yet the Fish and Wildlife Service did know of an alternative that was likely to be competitive. And, in fact, they decided they didn't need to consider it because the standard that they were trying to satisfy under the Endangered Species Act minimized the impacts that it would take to the maximum extent practical. They said the standard was a jeopardy standard. But that standard cannot have been the standard that they needed to satisfy. The jeopardy standard was already in the permitting requirements, in the fourth of the permitting requirements under Section 10, a standard which basically repeats the jeopardy standard. The second of those standards, then, must mean something else. And what it means is that because the species is endangered, because the population is already compromised, in order to get permission to kill any of them, we're going to make sure that we kill as few as we practically can. Can I just ask you a question? What is the status of this project right now? As far as I know, it's still waiting for the results of this case. But I really can't tell you what's going on on the ground. I'm sorry. Is it all constructed and waiting to hit the on switch? Ma'am? Is it all constructed and waiting to hit the on switch? No, no. Not to my knowledge. It's still being constructed? I think so. Okay. We have Buckeye's representatives here that you can ask that question. So, as I said, the Fish and Wildlife Service is applying the jeopardy standard rather than Section 2. And this is an important point because what that represents is an ad hoc interpretation of Section 10 of the Endangered Species Act in the midst of a permit negotiation. In effect, an informal adjudication. And it doesn't even merit a Chevron analysis. Why doesn't it? The handbook, at least my understanding is the handbook went through notice and comment. Is that correct? The 96 handbook did go through notice and comment. But if you look at the record in this case carefully, you will see very, very little evidence that the 96 handbook answered any questions. Well, if we're just trying to figure out now what this statute means and the agency has a handbook that went through notice and comment that gives it one reading, what level of deference is it entitled to? Well, in fact, we don't believe that the 96 handbook, the question of deference as to the 96 handbook is even relevant in this case because it isn't the interpretation that the Fish and Wildlife Service used. They used this ad hoc interpretation in answer to their questions and then as they proceeded to go through their findings, they applied a different set of guidelines, the 2011 IVAD guidance. But let me answer your question very specifically, even though we don't believe the 96 handbook is the interpretation that was applied in this case. The 96 handbook, the Ninth Circuit has said in the River Watch case, doesn't deserve deference. It doesn't deserve deference because it isn't applied to have the force of law. And in a number of instances, the agency itself doesn't follow it. In the National Wildlife Federation case versus Babbitt 2000 in California, the Fish and Wildlife Service argued that it wasn't bound by the 96 handbook. In 1998 in Alabama, Sierra Club versus Babbitt, the court said it could find no evidence that the service follows. Was it bound by this particular interpretive provision within the handbook? Ma'am? Was it bound by this particular interpretive provision within the handbook? Was it following? Is that in the cases you're talking about when they said they weren't bound by it? Yes. No. In fact, they wanted to go a different direction. On this minimized mitigate? Well. On minimized mitigate or some other aspect of the handbook? I can't answer that question clearly. But in fact, let's talk about minimize and mitigate as the 96 handbook sets forth. It doesn't give any guidance as to what to do in this case. And one of the reasons is this case is an unusual one. Most of the cases under the Endangered Species Act deal with the question of impact of habitat destruction or harm. It's a rather unusual matter where we're talking about directly killing endangered species. And because we're talking about directly killing endangered species, the meaning of the statute as it applies to minimizing the take to the maximum extent practicable becomes really important. And that's why we think the Gerber case that this court decided in 2002 is so vital. It does two really important things. The first of them is that at page 184, the court says that it's plain on the face of the statute that the service must make a finding. And the finding that the service must make is that the application is minimized to the maximum extent practicable. That means the Gerber court, which had an extended discussion of mitigation, separately said that when you come to minimization, you're going to make a separate finding. Do you dispute that to the extent practicable includes things like cost-benefit analysis as a component? Practicable includes? Cost-benefit analysis. Cost-benefit analysis. Well, what practical means, we believe, has been determined in some respects by precedence of this court in the Ashton case, which happens to be a lead poisoning prevention case. The court construed similar language so that it means feasible. And feasible begins with- Is cost-benefit a factor in that? Cost is a factor, but in section- But whether it's worth the candle is that part of it. Not just cost, but whether the benefit you're going to get is worth the cost that you're going to incur in the process. Our view is that the second of the permitting requirements does not say that you balance, in some outside way, the issue of benefit versus cost because Congress has set a different standard. Congress says it's so important that we minimize the take to the maximum extent practical that we're not going to say we're going to balance cost and benefit. But that's not the language that Congress used. The statute said minimize the impact of the take. Exactly. So when Congress wants to speak directly about the take, it knows how to, because in the previous subsection it says it describes an incidental taking. Yes. So Congress didn't say you have to minimize the actual taking. No. It said you have to minimize the impact of the take. That's certainly true. Those are two very different things. They can be very different. They can be very different. And if we're talking, for example, about habitat destruction, we could say, you know how you can minimize the take of habitat destruction? Instead of putting your project here in the highest quality habitat, put it over here in the lowest quality habitat if it's practicable to do so. But when we're talking about the taking of a group of individuals, then the most sensible, the most obvious, the clearest way to reduce the impact of that take of a group of individuals is to reduce the number taken. That's how you reduce the impact of the take of a number of individuals. We don't see a lot of cases about that because there aren't a lot. Normally people are killing them directly. Maybe you could do all these extra efforts and save two bats over here, or you could take mitigation measures over here, which would actually create a very important breeding ground that would actually increase the number of bats by 50. And so the net, under their theory, would be 48. Under yours it would be saving two. Why isn't that a reasonable construction of the statute to say, look, we're going to look at the whole picture of what's being accomplished here and its impact on the species? Well, we do indeed have to look at the whole picture. And Congress said do both. It said minimize and it said mitigate. Both of those words are presumed to have meaning. And what happens if you do what the Fish and Wildlife Service did in this case, and that is you do a little bit of minimization, which I will call reduction, not minimization, because minimize means reduce to the minimum. If you do a little bit of minimization and then you switch over and say, hey, we can do some mitigation too, and you do some mitigation and say with this mitigation we've netted out the number of individuals that we've brought our minimization down and are going to lose, what the effect of that is is that you never do what Congress told you to do. Congress said minimize. And what you have done instead is simply reduce. You didn't minimize to the maximum extent practicable. You simply reduced. Thank you. I'll reserve the remainder of my time for rebuttal. Thanks. Mr. Stockman. Thank you. May it please the court. My name is Robert Stockman. Here on behalf of the U.S. Fish and Wildlife Service with me at council's table is Paul Weiland for Buckeye. He will talk more about where the facility is, but the short answer is it has not yet been built, and it's also being held up by petitions before the Ohio Siding Board, among other plaintiffs. But we ask this court to affirm the district court's decision and uphold the ITP. I'd like to start with the ESA claim, laying out our affirmative case, and then quickly discuss some of the biggest problems with their case. First, here the service reasonably found, based its analysis primarily on a biological analysis. It's a wildlife agency. Can you just help me up front with this statutory construction question of how to read, minimize, and mitigate to the maximum extent practicable? And in particular, I didn't read your brief as claiming Chevron deference to a handbook position that looks at the two together. Oh. Well, I meant to claim. I mean, we did cite Chevron and discuss how. You did cite Chevron. You didn't argue for Chevron. It's a notice and comment document. I would note that they didn't cite the they're saying now that we've backed away from that in other cases. They didn't cite any of those in either their reply or opening brief. Well, how about your 2011? I mean, that's a 96 handbook. In 2011, you have the Indiana BAT, not a handbook, guidance or whatever it's called, and that seems to say the opposite. And your environmental impact statement here also seemed to prescribe the opposite approach to doing it. You do it in stages, minimize first, and then mitigate the leftovers. So there's twice in the agency with respect to this specific context use the opposite test in articulating the rules. So what am I supposed to do? The ultimate test is the one that's laid out in the handbook, which is the 1996 document. It is true that for the Indian, but there's discretion about how to process applications. And the Indiana BAT guidance makes it clear that because there's a lot of uncertainties about Indiana BATs, about mitigation, about wind power, we will focus on minimizing first before we get to mitigation. But that isn't to say that we've changed the fundamental standard. And one thing I would say about the handbook, and this is at the Joint Appendix at 1293, is it emphasizes that it sees, quote, each HCP would be unique to its own factual setting, unquote. And it lays out that this isn't, you know, each species is different. Each project is different. Each thing is going to need to be processed in its own way. So we haven't come up with some kind of cookbook of exactly how to process each and every thing. And the handbook says that. But the ultimate question is a two-factor question. First, the biological impact to the species. And then only after that do we get to practicability. When it comes to wind power, it is true we emphasize minimizing first because we just have enough uncertainty about this particular species and these particular projects that we think minimizing is really important. So that's how we process them internally to the agency. But we don't think that that wasn't. If you thought minimizing was really important, why didn't you include some viable alternative in your NEPA analysis that actually minimized them and was viable? First, the proposed alternative does an amazing amount to minimize, and they've done a good job of exaggerating. That may be very well, but if there's another economically viable option that would have minimized even more. So you're always going to be able to go just a little bit further. Here you have an option, right? The proposal has a maximum cut-in speed in fall of 6 meters per second and 5.75. They're saying, oh, you should have looked at 6.5 throughout the year. That's marginally different than 6, and the science just doesn't show definitively whether there's an added benefit there, and if it is, it's probably pretty small, whereas it's much more costly. Now one thing to keep in mind is their proposal is on its face more unreasonable than the maximally restricted alternative. Where did you explain all this in your NEPA analysis? Well, I think that in the response to comments at page 567 through 68, we said that there's where we said to the extent they need to show that this is what's the maximum extent practicable, we've done that. Earlier in the pages immediately preceding that, we discussed we've looked at all the studies, and there could be benefits. The Fowler Ridge study showed a statistical difference. Yes, but the Arnett study showed no statistical difference. And the Arnett study, and this is in the record. Maybe you should have done the study to figure out. Well, I mean, actually, that's the great thing about this project is we're using adaptive management to figure out what works for this facility, because if there's one thing that has been shown through all the studies is different facilities are different, and here we start with the proposal, but if we get more take than we're expecting, there are a number of trigger points that are actually quite low, then they have to increase speeds. Including 6.5, which shows that 6.5 is a viable option, and there is scientific evidence that you're aware of that it reduced the amount of take. So why wouldn't that be the obvious thing to consider in your NEPA analysis as opposed to the shutdown alternative that was never viable to begin with? Well, I think at first the shutdown alternative is easy now to say it wasn't viable. It was said it wasn't viable in 2010. One person expressed that viewpoint, and you're looking at e-mails that have no basis. Now we have an actual... I got Mary and Megan both saying one says it's not economically viable, and the other one says it's not really an alternative. And then you have the benefit to taking a... First, if we hadn't done it, we would definitely face a challenge today for not considering an alternative that had tried to minimize, to avoid all impact. Second... Well, you're not limited to three. You could have done four. I mean, there's been... I don't know why you think that you could only do one or the other, given that there were serious questions at a bare minimum about whether the shutdown alternative was ever going to be viable. And, in fact, you said we know that we just want it there for a comparison point, as I read your explanation. It was a valuable comparison point. It may be a valuable comparison point. It doesn't mean it's also that it is the limit of the reasonable range of options, does it? No, but... So if we're talking about the NEPA claim, it's crucial here to look at, first, their alternative, the one they put all their eggs in the basket now, is 6.5 meters per second year-round. That makes no sense, because the Indiana bat is in the ground for five months out of the year. So the very option they're proposing doesn't make any sense. Okay, what about the Buckeye alternative, but subbing 6.5 instead of 6? So we take Buckeye's application... That seems exactly what NEPA would be... you'd want to test under NEPA. You're not tied so rigidly to what they propose, but you've got a number here. Studies have found that it makes a big difference. That's your goal. Studies have not shown that, Your Honor. Well, your comment said the Fowler one found a statistical difference. A statistically significant difference is not a big difference per se. A relative difference, a material difference. A difference between 68% reduction and others. The later Fowler study showed that with 5.5 meters per second, you're up to 73% reduction, and then the Fowler study we're referring to gets to 80%. So you're talking about the difference between 73% and 80% when you've already reduced the number of bats taken per year to 5 out of a population of 305,000. That's the Midwest Recovery Unit alone. Well, you said you're hoping it's 5. We're hoping it's 5, and if it's not, they have to raise the speeds. I mean, this is not... Can I ask one technical question about this? So the delta is between 68% and some higher figure, 73%, 78%, or 80%. I don't know which exactly one we're looking at. But even with respect to those, do we know that it's 68% to 78%? Or is there confidence intervals that kick in and tell us that there's some degree of possibility or likelihood, wherever you are on the spectrum, that you could have that difference? There are confidence intervals, but there are studies that show with 5 meters per second, you get up to 82%. They present it as though it's always the case that the study shows 6.5 is better, but that is definitely not the case. There are numerous studies that find no difference, and some studies find that with 5 meters per second, you get all the way up to 80% reduction. So, I mean, to say that the agency... Were there studies that you credited? Sorry? Were there studies that you credited? Yes, I mean, they say that we didn't credit it because we acknowledged one potential weakness in the study. But yes, we did credit it. It's in the EIS, and we don't think that it... It doesn't prove that 5 is always as good as 6.5. But in just the same way, the other studies don't prove that 6.5 is always better than 5. Does that make sense? This is an area of scientific uncertainty. And the whole point of the adaptive management plan is to address that uncertainty. And I think it's really a mistake to look at this and get down to, well, you could have done marginally this and overlook all the various efforts that went into minimization going in. So I think one question is that what you've articulated now perhaps sounds plausible if it were the agency determination that we were reviewing. So if the analysis itself had proceeded along this way and said, you know, one might think that we ought to consider a 6.5 instead, but here's the problems with considering a 6.5. If you look at it, it's actually not even clear that it's better. And even if you look at the studies that say that it's better, it's not clear that it's actually that much better, if that makes any sense. But that's not in the... Oh, it's in the response to comments. I mean, it's not in the layman's term. I mean, one thing is these things are written by biologists. But if you look at the response to comments, the response to comments say, you know, some studies have shown better, some have shown not. When they say it could have benefits, that is a very... Could is a very well-chosen word, right? It could. That is not at all, for example, like this case in Gerber, where you have an applicant that says this would greatly reduce take. There was no disagreement that this would reduce take, that that would reduce take. Here, the most agency scientists who are, if anything, tend to be very favorable to the species, right, tend to be very invested in the species, which is a good thing. The most they can say is this could have benefits, but we've already reduced it to the point where there's no impact at any population level, the maternity colony level, the local maternity colony level, the wintering population level. So at that point, does it make sense to force them to do something that is at least three times as expensive? That was confirmed by the Arnett study, or, I mean, the Arnett study gives an example of that. And where they've proven it's much more expensive, is that a sound enough basis to say we reject your application? Wait, just so that I understand, what are you saying that the Arnett study proved? One thing the Arnett study proved, and this is in the joint appendix at 11.1113, it said changing from five meters per second to 6.5 meters per second loses you power at three times, you lose three times as much power. And we don't find a statistically significant difference in bats' deaths. Now, it's true that there weren't a lot of windy nights between those windows, so they can't be sure that there isn't a difference. That's the statistical problem, is that there aren't that many windy nights between five and 6.5. We don't control the weather. But even then, we could find that there was three times as much cost of power loss by doing that. Now, I don't want to suggest that one facility can be taken and just put on this facility. I mean, you can't do that. They're all different. They're all in different locations. The bats act differently. But there's no question that the 6.5 would be significantly more expensive, and there's significant doubt about how much advantage it has. And so the question for the agency was, would it be reasonable to reject this application that has done a lot to minimize and mitigate to the maximum extent practicable? And then the question for this court is, was the agency's finding that they had met their burden arbitrary and capricious? Where's the best place that the agency talked about the significant doubt about the benefits afforded by 6.5? I think the response to comments, and that is, and I apologize for not having the site. Is that the 10J1050s? That's some of it, and then a little bit right before 567. So there's two different responses to comments, both in the EIS and to the record of decision. And there the agency did. I mean, at the same time, we don't want to suggest we don't value. I mean, the agency was making a judgment call based on the best science it could, and it just didn't know precisely what the advantage of this was. And you've already reduced it to no significant effect at any population level. If this wind power project came in and made serious efforts to do the best possible job to protect the species, and if this isn't going to be enough, there's a real concern. I mean, how hard is it going to be for no matter how much a wind power project is willing to do to preserve a species? Are you saying that under NEPA, if an agency believes that the impact is not significant, then it has no obligation to study a reasonable alternative that would potentially minimize the impact? I wouldn't say that precisely, Your Honor. What I would say is that alternatives that are sufficiently similar, you don't have to analyze each one. And if you take this issue, the 6.5 versus 6 versus 5.5, out of just the kind of – first, we've already reviewed all the mortality data. Aside from mortality, they are basically the same. And one benefit to the maximally restricted is you see how similar everything is in every other respect. There's not an added advantage if it's significantly similar. And in the agency's view, these are pretty significantly similar. I mean, sure, you can always go in and say, well, this is really different, but you don't have solid mortality data. We reviewed it all already on that difference, on the 5.756 versus 6.5. And then in every other respect, they're the same. Then you don't have to do another alternative. That's Westlands, which is really crucial because there are a lot of projects where there literally are an infinite number of combinations. Where in the record does it say these are all significantly similar? So what I would – what it is, Your Honor, is if you read through the EIS, which I would recommend, it's great, the maximally restricted alternative, and you compare it to the proposed alternative. Well, I think we're asking what the up-front question is of what you should have compared in the EIS. Telling me the after-the-fact EIS sounds really good just begs the question of whether a materially different outcome would have resulted had you added a fourth option to your environmental impact statement. And so you sound – maybe I'm assertive. I thought you were saying we decided not to put that fourth option in because we decided between 5.756 and 6.5, no significant difference or significant similarities in fatalities. So that's the ESA issue. For the NEPA issue, what I mean is if your concern is are these really different, one benefit is if you look at the impacts of maximally restricted and the proposed, and those are about this far apart in terms of cut in speed. What we're talking about now is right around here. These are on most environmental resources. Well, I think that's a problem. For your NEPA analysis, you're not supposed to sort of go to the two extremes and then throw the companies in the middle and say we've done a reasoned analysis. I think that often you do want to have extremes in there. You may want to have the extremes, but shouldn't you have a reasonable range of alternatives, something other than total extremes, neither of which anyone goes in thinking are really going to be viable at the end of the day? I think that there's no minimum number of alternatives, and you can always layer in extras. The question under NEPA is did you – You can say very well. The question is whether it's a reasonable range to include the two extremes and the companies and nothing else. Did it let you take a hard look at the environmental consequences of your action? Exactly. And yes, this did, and there is no difference between theirs. If you look at the various consequences, you can't find a place where the slight difference they're talking about would have had different environmental consequences if you compare the maximally restricted and the proposal, and they're almost always the same. This extra alternative would have been basic with respect to everything but bat mortality. NEPA is about looking at everything. Everything but bat mortality. My goodness. That's what this is about. The other thing is that the service was very clear that it did not think it could say this is the amount of reduction you get with 6.5. This is the amount you get with 5.75. The science just isn't there yet. It just isn't. For purposes of NEPA, you couldn't do a NEPA analysis because you had a lot of people in the agency saying concerns about how very minimal this EIS was going to be with only these three options, and talking about 6.5 and proposing 6.5 and saying the no action one. Okay. Sorry, but it counts. Not for my purposes. On the reasonable range of alternatives. I know you have to put that in there. That's fine. For this reasonable range of alternatives. If it's not really an alternative. I think that it's very, I guess I just don't think that the restricted use alternative was not really one. We did the analysis and discovered that it was massively more expensive. If we hadn't done that analysis, they would have said, well, how do you know it's massively more expensive? We got numbers. $241 million in lost revenue. You had agency people. Sorry. You had the advisor and then you had agency people saying it's not economically viable in 2010. Doesn't that mean maybe someone else disagreed. I'm asking you to show me that, but doesn't that mean you maybe need to throw in another option? I'm not aware of any precedent that supports the position that you have to throw in yet another. Is there any precedent that says picking things at the extreme, maximally and minimally, and then the company's option is sufficient? What case says that? As a reasonable range. There's a lot of cases that say that when you get an application, you're allowed to give a lot of weight to the applicant's desire. I'm not disputing that. That definitely needs to be in there as one of the options. And, boy, you sure make it look good if you go to the extremes. And those are the only other options you consider are the most extreme ones on the other end, apart from no action. But also just remember, right, the difference in BAT impact between the extreme is zero to this, which is five, to minimal is 12. These aren't huge differences even at these extremes. Well, if you're talking about an endangered species. I mean, but of 305. Endangered species. You're talking year by year and year after year. That's a problem. And as you both know, as you well know going in, these are guesses. That's why you have the whole adaptive management there as a backup, which certainly indicates that 6.5 is completely economically viable. The adaptive management plan says you're going to have to go to 6.5 if you're killing more than five bats a year, correct? It does say that. So it's certainly economically viable option for the company. Well, not year round. I mean, their option was not economically viable. Their option is not. I mean, their option. This is part of what's weird. The option they're saying we should have considered was clearly not well designed because it involves doing. The Fish and Wildlife Service option on J96 for someone in Fish and Wildlife Service is recommending 6.5. I mean, sometimes we could have done 6.5. I just don't think you have to do each marginal improvement. That may very well be. The question is whether you need to test the company's proposal with something other than the extremes at either end, which you have labeled maximally and minimally. I guess the downside, Your Honor, and I apologize for going so far over, is that I think that you can always say if you do just a little increment more, it's going to be fine. A little increment more, it's going to be fine. And they also submitted a proposal saying do 7 meters per second. Do 6.7 meters per second. Do 6.5 during these seasons and not these seasons. I know, but you would be able to say, look, we got the bookends here with maximal, minimal, statutory requirement of no action, and then we tested it against another viable alternative. We don't have to do it against every other viable alternative, but we actually tested it against another viable alternative that had been proposed. And here is our conclusion. But without that, you're really missing, I think, any real heart to the analysis, really pushing and analyzing the consequences of the line the company has proposed. I guess the reason I don't see a problem is I don't see any way in which we failed to take a hard look at the environmental consequences. All of them are laid out in the EIS. They're all depicted for the public. But we held, or I don't know if it's correct to say it's a holding, but it's correct to say that we said it very clearly in the Theodore Roosevelt case, quoting the CFR, that the range of reasonable alternatives must include technically and economically practical or feasible alternatives in describing what the NEPA obligations are. That language is in the appellant's brief. I noticed that it's absent in your brief anywhere because you just want us to say, was there a hard look and conclude that there was a hard look and just kind of ignore this apparently. I mean, what am I to do with Theodore Roosevelt in this regulation? I think that it is true. So we often, I have never heard of a court saying you should get in trouble for looking at something that turned out not to work out. And that would put the agency in an impossible bind. We are regularly being chastised for not looking at things which turn out, you know, because we think they won't work. With respect, I don't think that's the question. No one's saying you couldn't have included the extremes in there. I understand that. But to the extent that, but one thing is you knock off this to try to be like, oh, well, this whole part of the analysis doesn't count. And that's just strange to me because it's all still depicted for the public. It's all still analyzed. And so I guess if this is turning NEPA into getting away from the whole point of NEPA, which is to look at the environmental consequences, not to look at every single possible option. I mean, I just, when I read, my understanding of NEPA is it's about looking at what the environmental consequences are. It's not so much about, you know, every single possible option needs to be depicted. I didn't say that. I read to you a regulation promulgated by the government that you're representing that says the range of reasonable alternatives must include technically and economically practical or feasible alternatives. Yes. That's what we said, this court said, that I'm, that we're all bound by. And it's quoting in part a regulation that describes how NEPA is supposed to work. So how am I supposed to apply that language and that regulation to this case? I would submit that we looked at alternatives that met those requirements. That regulation has been interpreted by CEQ to acknowledge that you can't look at every, like all the alternatives that possibly meet it. And the general rule is if alternatives are sufficiently similar, you don't have to break them out because you can always do it infinitely far. And that is, I mean, what's wild here is how not different their proposal is from the proposed alternative, except for it's not nuanced and it's not careful and it includes the winter. And it's just wild to say, well, you have to look at that too. When, in all other respects, it's the same. All other respects, it is the same as the alternative you looked at. You're setting up a straw man, it seems to me, in that you're saying that what we're supposed to do is to see whether it was reasonable for the agency or whether the agency should have studied the alternative that one commenter, these particular plaintiffs, put forth. That's not the standard. That's true, Your Honor. I think the other dilemma here... So why wouldn't it have been not rocket science for the agency to say, well, to the extent that during the seasons where the bats are active, the cut-in rate, what would the difference be? And let's let the public know and let's let Congress know and let's look at ourselves what the difference would be if the cut-in rate, the maximum cut-in rate, was 6.5 or 7 or 6.75 or pick a number. So why not just one more, slightly more rigorous alternative than the applicants? Yes. How about one more viable alternative than the applicants? I mean, I think that we're just in disagreement about the value of looking at other things, looking at the full scope. I mean, if I were in here defending without the extremes, I would be in a lot more trouble because there would actually be precedent on the other side. But I do think that the problem is you just keep getting marginally a little further. I know. Just to be clear, as you said, you're happy to have the extremes here because if you had no action and just theirs, you'd be in trouble. But to be clear, you're agreeing those are the extremes. And other than the extremes, you didn't have anything other than the proposal from the company. I mean, we had four alternatives. You're not suggesting that no action was your other viable alternative, right? Sorry. It's part of my – we have to – I was including that in the extremes. I'm sorry. Three. Three. We had three options. We didn't break out – I mean, if project designs had to be this specific and each and every one of them carried through the action alternative where you're breaking out just marginal differences, I think the sizes of EISs would get massive. The differences would be completely swamped. There is no difference that we can say scientifically between these two. So we have yet another alternative that we'd say we don't know if it's any different. And in all other respects, it's the same. I don't think that is helpful for the purpose of NEPA, which is to clearly define the issues and help make an infirm choice and look at the hard impacts. But I've exceeded my time, so I apologize. Thank you. Thank you. Thank you. May it please the Court, Paul Weiland for the intervener appellee, Buckeye Wind. I'd like to just take a little bit of a step back and start with the fact that my client is absolutely committed to responsible development of clean energy, and this is a pressing issue for this country and humanity. Buckeye has spent years, over a decade in fact, and millions of dollars, analyzing the potential impact of this project, securing permits for the project in order to construct and operate it. Also, federal appellees point out in their brief that there are acoustic studies in the record that demonstrate that 99.9% of Indiana bats never fly to the height of the turbines. So with respect to minimization, we're starting with an automatic minimization measure there because of the technology that's being employed. In addition, siting decisions and other steps were taken in order to minimize the effects on the species. As a consequence, the potential for bat collisions is very low. To further reduce this, we've used a combination of feathering, cut-in speeds, and the adaptive management program that my co-counsel mentioned, which we believe go to great lengths in order to protect the bat. There was extensive discussion here about the potential for reductions as a consequence of increasing the cut-in speed marginally more. But when we're talking about five bats a year, and a population that in fact actually, of the species, well exceeds 400,000, we're talking about maybe a bat a year. And there is, as you have heard, uncertainty about the statistics. I'm sorry, I didn't understand what you said. I thought it was five bats a year, and now you're saying it's one bat a year? Did I misunderstand what you said? The incremental difference is very small. I'm sorry, go ahead. Yes. So, from my perspective, this could really only be regarded as negligible. I'd like to just mention two other things with respect to the NEPA and ESA claims. First, I'll start with the ESA claim. I think you've got to start with the text of the statute. And to an extent, the sequencing issue, my co-counsel, the opposing counsel mentioned, as they have done in their brief, they focused on minimization. The idea that minimization and mitigation are separate is not the way the text of the statute reads. And that's for good reason. First of all, it's what Congress said, and so that should really be the end of the matter. But the point made by Judge Millett actually makes the point very well. There are circumstances where mitigation may be superior to minimization. Congress wrote something that is biologically intelligent, you know, almost five decades ago, four decades ago. So I think both the text and the science support that interpretation of the act. With regard to the NEPA issue, I would say one advantage of using alternatives that are bookends, that are at either side of the spectrum, is that that then allows the agency, and the agencies have done this before in many, many cases, to pick anything between those alternatives. The agency isn't limited to just those three alternatives. If it decides on the basis of review of those that it wants to pick something in between, the agency can and does do so. And I would also say, with respect to the issue of viability, that I think that a full review of the record will show that my client was saying, from the beginning, that this was not viable, but that the service was testing this. The fact that there are emails where shorthand was used about viability, followed by another email or handwritten note where it's made into a question, just shows that, yes, my client has maintained this all along, and it was borne out at the end. But it also shows that the service decided to test the issue. And if the service didn't, it would be irresponsible. My client could well have maintained that 6.5 or 6.0 was nonviable, too. And if the solution to that is we don't study it, that would be improper from our perspective. With that, I'll thank the board. Thank you. Do you agree with his description as to the status of the project? Yes. The project, there's no on-the-ground activity going on right now. The hope is to resolve this issue and an issue pending in the state as well, and then to move forward. Thank you. Mr. Weeks, I think you're out of time. We'll give you three minutes to start with. First, with respect to the issues of significance of difference, there are several cases. Out of this district court in 1991, Sierra Club v. Evans, the court indicated that in response to an argument that the risk wasn't significantly different, the court said a little impact doesn't equal no impact. Similarly, in Southern Utah Wilderness v. Norton, this district court in this circuit said the fact that a preferred plan reduces impact to insignificance does not mean that less harmful alternatives need not be considered with respect to your point. And on yours, Judge Goulet. Are you agreeing that it's an insignificant difference between the two? Well, that is exactly the next point that I want to make. Let's talk about the Gerber case for a second. The briefs in the Gerber case indicate- I think you'd rather just talk about the record in this case. Well, let me then start there. What we're talking about in terms of difference, if our math is correct- By the way, let me do away with the proposition that we're saying 6.5 year round. Of course we're not saying 6.5 year round. We know the bats hibernate during the winter. There'd be no point in setting 6.5 cut into it. That's simply not the proposal we made. If we didn't say it in our comments, it is merely because all we were talking about is restricting cutting speed during the summer. But if our calculations are right, the difference between the 6.5 predicted performance at 80% or 79 point something percent reduction in speed, and the chosen alternative is 50 bats over the course of this project. So the government is in the position of saying it doesn't matter that we kill 50. There's going to be less bats, endangered bats, over the course of this proceeding. In the Gerber case, we're talking about one fox squirrel every three years with the alternative that they chose. And the court said no. If there's an alternative that would result in a reduced impact lower than one fox squirrel every three years, you must consider its practicability. Can I just- the 50 bats, just walk me through how you got to 50? Applying the 80% reduction to the 400 bats that would be considered with no measures and the 68% reduction to that same overall figure. So the delta between 68% and the other percent over the life of the project. Right, over the life of the project. And to us, that's not a matter of insecurity. So are you saying that under NEPA, the non-endangered bats are irrelevant? Not at all. In fact, that's one of the reasons that this alternative needed to be considered quite apart from the requirements of the Endangered Species Act, which are clear in terms of minimization. And in fact, the Fish and Wildlife Service in the 2011 bat guidance came to the same conclusion, minimize first. But wildlife has an impact under the National Environmental Policy Act separate from endangered species. And we're talking about 32,000 bats over the course of the life of this project that are likely to be killed with the current measure and many, many thousands fewer with a reduced impact alternative. And what is the difference between 32,000 under theirs and how many under yours? I didn't do the math. Okay, sorry. I'm sorry. Thank you. Thank you. The case is submitted.
judges: Srinivasan, Millett, Wilkins